UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

TIANNA WINGATE and
DELPHIA HUDSON,
on behalf of themselves and
all those similarly situated
who consent to representation,

       Plaintiffs,

     v.

THOMPSON INSURANCE
ENTERPRISES, LLC,

       Defendant.

CIVIL ACTION

NO. 1:09-CV-3579-CAP

O R D E R

    This matter is currently before the court on the defendant's motions for summary judgment [Doc. Nos. 36 and 74] and Mr. Rosenberg's objections to the reasonableness of the attorney's fees awarded against him.

    This Fair Labor Standards Act (FLSA) collective action was filed by Wingate and Hudson on behalf of a group of similarly situated individuals who were employed in the position of underwriter with the defendant ("Thomco"). Teresa Mote-Danielson, Theresa Tarkey, and Sheila Block opted into this action as plaintiffs. All the plaintiffs claim that, during their employment as underwriters at Thomco, they worked more than 40 hours per week but were not given overtime compensation in violation of the FLSA, 29 U.S.C. § 207. The defendant maintains that each of the plaintiffs falls into the category of "administrative employee" and

that Wingate additionally falls into the category of "executive employee" such that they are exempt from the overtime compensation requirements of 29 U.S.C. § 207 pursuant to 29 U.S.C. § 213. The defendant has file a separate motion for summary judgment on each ground.

## I. Factual and historical background

Viewed in the light most favorable to the plaintiffs, the undisputed facts in this case are as follows. Thomco is in the business of designing, creating, and selling insurance policies focusing on such target industries as senior living, medical transportation, pest control, and tanning salons. During the time frame relevant to this case, all of the plaintiffs were employed by Thomco in a position Thomco called "underwriter." As underwriters, the plaintiffs were paid on a salary basis, regardless of the number of hours they worked. The plaintiffs all claim that, with some level of consistency, they worked over 40 hours per week as underwriters but were not compensated at the statutory time-and-a-half rate for those extra hours worked. See 29 U.S.C. § 207. None of the plaintiffs have been able to produce written records of extra hours worked.

The duties of the plaintiffs in their roles as underwriters is the main point of contention in this case. It is undisputed that the plaintiffs' duties included work on the appropriate pricing of

insurance policies that came up for renewal and that they worked with computer programs known as RateForest and/or QuickSolver to assist in that task. The defendant has produced evidence that Wingate prepared a job description document for underwriters at Thomco. Under the heading "Duties/Responsibilities," it lists such tasks as "[r]espond to insured, producer, & carrier requests . . . ," "[r]eview and analyze losses with the manager at time of knowledge of the loss . . . ," and "[r]eview and identify unprofitable renewals at least 90 days prior to expiration and take appropriate action (pricing, deductibles, or non-renewal) . . . ." Under the heading "Objectives," the job description document lists, *inter alia*, "The underwriter shall uphold the underwriting guidelines set forth by the carrier & calculate the appropriate premium for exposures." [Doc. No. 74-6, p. 2].

Much of the deposition testimony cited by the defendant in support of its motion for summary judgment based on the administrative exemption [Doc. No. 74] and the statement of undisputed facts in support thereof focus on the underwriters' duties regarding the pricing of policies. The defendant claims that all the plaintiffs were employed in administrative positions and rely largely on this pricing evidence to show that their primary duties included "the exercise of discretion and independent judgment with respect to matters of significance," as required by

3

29 C.F.R. § 541.200 to qualify for the exemption.

The testimony cited by the defendant shows that the plaintiffs, as underwriters, were charged with applying so-called credits and debits to accounts that were up for renewal and thereby lowering or raising the account premium quote for the next contract period. The underwriters arrived at the renewal premium by taking a baseline premium (such as the premium from the previous contract term) and applying factors to that baseline (often based on various categories of exposure) to either decrease (credit) or increase (debit) the premium. For instance, an underwriter might apply a credit factor of 0.95 to a premium for a renewal account for a company that had in place a formal emergency plan. In contrast, an underwriter might apply a debit factor of 1.1 to a premium because of historic losses suffered by the insured on the account.[1] The defendant cites deposition testimony indicating that the plaintiffs each ostensibly had authority to change a premium up or down by 25% from the baseline [Doc. No. 74-18, ¶ 14].

Based on this evidence and evidence that the underwriters performed other tasks such as assisting agents and clients with policy coverage questions and negotiating with agents, the

---

[1] These examples are not clearly and explicitly set out in any of the materials before the court in the summary judgment record. They are included only as hypotheticals to explain the pricing tasks in which the plaintiffs were involved.

4

defendant moved for summary judgment relying on the administrative exemption to the FLSA's overtime compensation rule [Doc. No. 74].

In addition, the defendant has moved for summary judgment on Wingate's claims based on the executive exemption to the FLSA's overtime pay provision [Doc. No. 36]. The undisputed evidence in this case shows that, from approximately October 2007 until May 2009, Wingate was employed as supervisor of the Tan Pro underwriting division [Doc. No. 36-8, ¶ 7].[2] The record on summary judgment shows that while Wingate was the Tan Pro underwriter supervisor, there were approximately seven to ten other underwriters in her division, and some Thomco employees "kind of"

---

[2] Though the Amended Complaint states a cause of action for a willful violation of the FLSA's overtime provision, which carries a three year statute of limitation, 29 U.S.C. § 255(a), the defendant's proffered evidence on summary judgment focuses on the period during which Wingate was labeled a "supervisor," which, apparently, was between October 2007 and May 2009. See, e.g., Doc. No. 43, ¶¶ 4-7. In addition, the defendant cites much evidence regarding Wingate's duties after May 2009, when she was a manager. See, e.g., id., ¶¶ 13-15, 17, 21-23]. She no longer claims that she was a non-exempt employee at that time.

The summary judgment record is somewhat unclear on what Wingate's duties were prior to October 2007. See Doc. No. 43, ¶ 3 (referring to Wingate as a "Lead Underwriter" and setting out evidence that there were approximately seven to ten other underwriters in her division at that time). While, as shown infra, there are genuine disputes of material fact regarding Wingate's duties during the time she was a "supervisor," the defendant has failed to carry its initial summary judgment burden with regard the time period from December 2006 (which, according to the court's calculation, is the cut-off point for statute of limitations purposes since this suit was filed on December 21, 2009) to October 2007.

reported to her [Doc. No. 36-8, ¶¶ 3 and 6 and record citations thereto]. The defendant also cites evidence that the other underwriters in Wingate's division came to her with their concerns, that she assisted other underwriters with giving quotes, sometimes conducted meetings, discussed new policies with other Tan Pro employees, approved write-off requests from others who did not have the same write-off authority as she did (i.e., up to $100), rarely prioritized work assignments to employees in the Tan Pro division, scheduled and approved time off requests for Tan Pro employees, and communicated to Tan Pro employees over email regarding the aforementioned subjects [id., ¶¶ 7-12, 16, 18, 20, and record citations thereto]. It is further undisputed, however, that Wingate spent approximately 80% of her time performing the tasks of a "plain underwriter" while she held the "supervisor" title [id., ¶ 7 and record citations thereto].

## II. Summary judgment standard

Rule 56(a) of the Federal Rules of Civil Procedure states, "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(c)(1) provides that a party must support its summary judgment position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information,

6

affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." The party seeking summary judgment bears the burden of demonstrating that no dispute exists as to any material fact. Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970). This burden is discharged by "'showing'--that is, pointing out to the district court--that there is an absence of evidence to support [an essential element of] the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). In determining whether the moving party has met its burden, a district court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. Johnson v. Clifton, 74 F.3d 1087, 1090 (11th Cir. 1996).

Once the moving party has adequately supported its motion, the nonmoving party has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Ultimately, the court's function is not to resolve issues of material fact, but rather to determine whether there are any such issues to be tried. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986). Facts that are disputed, but which

7

do not affect the outcome of the case, are not material and thus will not preclude the entry of summary judgment. Id. at 248. Genuine disputes are those in which "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," id., and, where the nonmoving party will bear the burden of proof at trial, "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient." Id. at 252.

## III. Analysis

Regarding overtime compensation, the FLSA provides, in relevant part, "no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). However, the FLSA also explicitly provides, "The provisions of . . . section 207 of this title shall not apply with respect to-- (1) any employee employed in a bona fide executive, administrative, or professional capacity . . . ." At issue in this case are the executive and administrative exemptions, and the applicable regulations expand on the meaning of "executive" and "administrative" as used in § 213, as set out below. In addition, the court notes that, "[a] job title alone is insufficient to

establish the exempt status of an employee. The exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's salary and duties meet the requirements of the regulations in this part." 29 C.F.R. § 541.2. Therefore the evaluation of the whether any exemptions apply is necessarily intricately bound up with the facts of any case.

In addition, "[i]t is well established that the employer bears the burden of proving the applicability of a FLSA exception by clear and affirmative evidence," Gregory v. First Title Of America, Inc., 555 F.3d 1300, 1302 (11th Cir. 2009), and courts narrowly construe the overtime provisions of § 207 against the employer in determining whether an exemption exists. Atlanta Professional Firefighters Union, Local 134 v. City of Atlanta, 920 F.2d 800, 804 (11th Cir. 1991).

**A.    The defendants motion to dismiss based on the administrative exemption [Doc. No. 74]**

The defendant has moved for summary judgment against all plaintiffs based on the exemption to the FLSA's overtime pay requirement for administrative employees [Doc. No. 74]. With regard to that exemption, 29 C.F.R. § 541.200 provides, in relevant part,

> (a)  The term "employee employed in a bona fide administrative capacity" in section 13(a)(1) of the Act shall mean any employee:
> (1) Compensated on a salary or fee basis at a rate of not less than $455 per week . . . exclusive of board, lodging

9

or other facilities;
(2) Whose primary duty is the performance of office or
non-manual work directly related to the management or
general business operations of the employer or the
employer's customers; and
(3) Whose primary duty includes the exercise of
discretion and independent judgment with respect to
matters of significance.

While the defendant claims that the evidence is clear that the
plaintiffs in this case fall into the category of exempt
administrative employees, the plaintiff has produced evidence
creating a genuine issue for trial, especially with regard to the
third prong of the above test.

The defendant relies heavily on the deposition testimony of
the plaintiffs and others showing that the plaintiffs, as
underwriters, were charged with entering debits and credits into
the computer programs used to generate premiums for accounts up for
renewal. This fact, argues the defendant, shows that the plaintiffs
exercised discretion and independent judgment by raising or
lowering premiums based on their evaluation of various factors such
as risk to the insurer and the amount of price inflation a customer
might tolerate. The defendant also argues that the plaintiffs acted
"with respect to matters of significance" under the regulation
since the defendant's overall success as a business depended
largely on the sales of insurance policies, and the defendant's
bottom line was therefore greatly affected by the plaintiffs'

actions.

Applying law to these "facts," which the defendant claims are beyond dispute, the defendant cites Edwards v. Audubon Inusrance Group, Inc., 2004 WL 3119911 (S.D. Miss. 2004) for the following proposition: "Underwriters decide what risks the company would take and at what price, which is clearly exempt work." In that case, there were "no disputed facts as to what [the plaintiff's] job duties were as an underwriter since the facts delineating his duties are based upon admissions [he] made during discovery." Id. at *4. Moreover, the court was able to conclude, "[The plaintiff] generated millions of dollars for [the defendant] and his independent underwriting decisions resulted in [the defendant providing millions in insurance coverage, thereby exposing [the defendant] to millions in exposure to losses and, consequently, providing millions in insurance coverage to accounts." Id. (emphasis added). Under those facts, summary judgment was appropriate.

The plaintiffs in this case, however, have produced substantial evidence that they were not afforded the opportunity to exercise discretion or independent judgment with respect to applying debits or credits to account premiums. First, the plaintiffs cite evidence that much of their time was spent entering information from customer applications into the computer programs

RateForest and QuickSolver [Doc. No. 86, ¶ 6]. From there, if a premium price change was desired, the underwriters were required to get approval from a supervisor [id., ¶ 9]. Although the underwriters did input debits and credits to raise or lower the premiums, they have also produced evidence that these debits or credits were entered at the specific direction of either Thomco management or a customer in order to reach a target price [id., ¶ 14]. In other words, supervisors or management instructed the underwriters on what the new premium amount would be for a certain account, and the underwriters then manipulated the various debit and credit criteria in the computer program to reach the designated amount, sometimes without reference to the actual risk category associated with the debit or credit [id., ¶¶ 14 and 19 and record citations thereto].

The plaintiffs' cited evidence is sufficient for a reasonable jury to return a verdict in their favor, and summary judgment based on the administrative exemption is therefore inappropriate. Accordingly, the defendant's motion for summary judgment based on that exemption [Doc. No. 74] is DENIED.

**B. The defendant's motion to dismiss Wingate's claims based on the executive exception [Doc. No. 36]**

In addition, the defendant has moved to for summary judgment on Wingate's claims based on the executive exception to the FLSA's

12

overtime pay requirement. With regard to that exception, 29 C.F.R.

§ 541.100 states, in pertinent part,

> (a) The term "employee employed in a bona fide executive capacity" in section 13(a)(1) of the Act shall mean any employee:
> (1) Compensated on a salary basis at a rate of not less than $455 per week . . . exclusive of board, lodging or other facilities;
> (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
> (3) Who customarily and regularly directs the work of two or more other employees; and
> (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

In her response brief, Wingate argues only that the second

prong of this test does not apply to her since, according to her,

her primary duty was not management during the time she was an

underwriter supervisor [Doc. No. 42].[3] Specifically, Wingate

emphasizes that she spent approximately 80% of her time performing

the tasks of plain underwriter, as opposed to those that required

more responsibility or authority. Thus, she argues, the primary

duty referred to in  29 C.F.R. § 541.100 was, in her case, that of

---

[3] Wingate, in her response to the defendant's statement of undisputed material facts [Doc. No. 43], objects or cites evidence tending to negate the defendant's evidence on the third and fourth prongs as well. Since summary judgment is inappropriate for the defendant based on the second prong, the court does not reach these prongs of the executive exemption test.

such a plain underwriter.

The relevant regulations shed some light on how to interpret the term "primary duty." 29 C.F.R. § 541.700 states:

> (a) To qualify for exemption under this part, an employee's "primary duty" must be the performance of exempt work. The term "primary duty" means the principal, main, major or most important duty that the employee performs. Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole. Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.
>
> (b) The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee. Thus, employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement. Time alone, however, is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work. Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion.
>
> (c) Thus, for example, assistant managers in a retail establishment who perform exempt executive work such as supervising and directing the work of other employees, ordering merchandise, managing the budget and authorizing payment of bills may have management as their primary duty even if the assistant managers spend more than 50 percent of the time performing nonexempt work such as running the cash register. However, if such assistant managers are closely supervised and earn little more than

14

the nonexempt employees, the assistant managers generally would not satisfy the primary duty requirement.

Based on these factors and examples, the issue of whether Wingate was an exempt employee remains a question of fact for the jury. Though, as the defendant reiterates in its reply [Doc. No. 47], time alone is not the sole test regarding whether an employee falls into the executive exemption, the undisputed fact that Wingate spent approximately 80% of her time performing plain underwriting tasks is persuasive. Other factors are inconclusive. There is little evidence in the summary judgment record on the relative importance of Wingate's exempt duties compared with her non-exempt duties. Evidence on the "freedom from direct supervision" factor is similarly inconclusive: time and again, Wingate took care in her depositions to explain that she needed the approval or permission of her supervisor, Bob Heaphy, before she took certain actions that the defendant claims constitute exempt work [see, e.g., Doc. No. 85, ¶¶ 20 and 22].

Finally, the relationship between her salary and the salaries of the plain underwriters deserves special attention. While the defendant points to evidence that Wingate's duties did not change significantly in May 2009, when her title changed from "supervisor" to "manager," the court finds that a reasonable jury could view the attendant annualized salary increase -- apparently from

15

approximately $60,000 to approximately $85,000 -- as evidence that Wingate's duties and responsibilities changed at that point, especially in light of the salaries earned by the other plaintiffs, which ranged from approximately $37,000 to approximately $50,000 [see Doc. No. 47, p. 14; Doc. No. 76-18, ¶ 3]. From this evidence, a jury could reasonably infer that Wingate's value to the company changed and that her salary increased because of or in conjunction with an increase in the relative importance of her managerial duties. Similarly, a jury could reasonably infer that Wingate's salary as a supervisor was already higher than the salaries of her colleagues that were plain underwriters as a result of the managerial tasks she performed then. As is evident, there are genuine disputes of material fact such that summary judgment is inappropriate.

The relevant case law is in accord. Although the defendant relies on Moore v. Tractor Supply Co., 352 F. Supp. 2d 1268 (S.D. Fla. 2004)(aff'd 140 Fed. Appx. 168 (11th Cir. 2005)), this reliance is misplaced. In Moore, the court granted summary judgment to the defendant employer where the plaintiff spent 95% of his time performing non-exempt activities.[4] The Moore court was, however,

---

[4] The applicable regulation in Moore was a prior iteration of the primary duty regulation, 29 C.F.R. § 541.103 (2004), but the most recent regulation is not substantially different for the current purposes.

able to determine that each of the factors other than proportional time spent on managerial activities -- i.e. the relative importance of managerial function, the frequency of exercise of discretion, the relative freedom from supervision, and the relationship between the plaintiff's salary and the wages of non-exempt employees -- also proved that the plaintiff's role was within the purview of the exemption. Id. at 1275-79. Similarly, in the cases cited by the district court in Moore, the courts were largely able to ascertain that the employees suing for unpaid overtime actually supervised (as opposed to simply worked with) the requisite number of other employees. Id. at 1274.

The facts of this case, in contrast, do not easily lend themselves to that conclusion. As shown above, application of the relevant factors listed in 29 C.F.R. § 541.700 does not result in a clear answer. Similarly, while it is undisputed that there were seven to ten other underwriters in Wingate's division and that, while she was a supervisor, some employees "kind of" reported to her, this evidence does not compel the conclusion that Wingate actually supervised anyone, either while her title was "supervisor" or before.

Especially in light of the narrow construction applied to the exemptions to the FLSA's overtime provisions, summary judgment is inappropriate for the defendant against Wingate based on the

executive exemption. Accordingly, the defendant's motion for summary judgment [Doc. No. 36] is DENIED.

## IV. Objections to the reasonableness of attorney's fees award [Doc. No. 93]

On May 26, 2011, the court entered an order sanctioning Mr. Rosenberg, counsel for the plaintiffs, "in the amount necessary to cover the costs and attorney's fees incurred by the defendant in re-deposing Plaintiffs Wingate, Hudson, and Danielson in this case as well as the costs and attorney's fees incurred by the defendant in bringing and defending its motion for sanctions." [Doc. No. 82, p. 8]. This was as a result of Mr. Rosenberg's inappropriate conduct at the first depositions of those plaintiffs.

At the court's direction, the defendant has filed a detailed specification requesting $1,817.70 in expenses and $24,537.50 in attorney's fees, for a total of $26,355.20 [Doc. No. 83]. Mr. Rosenberg has filed objections, which are both general and specific in scope [Doc. No. 93].

Mr. Rosenberg's general objections can be summarized as follows: the defendant had no need to re-depose the plaintiffs in this case, as is evident from the questions asked by defense counsel at the second depositions, which were duplicative of those asked in the first depositions in some instances. Thus, argues Mr. Rosenberg, he should not have to pay for the second depositions or

18

time spent preparing for them. What this argument fails to acknowledge, however, is that the second depositions -- and the duplicative questions -- were necessitated by his obstructive conduct at the first depositions. Accordingly, these objections are OVERRULED. The court has reviewed the remainder of Mr. Rosenberg's general objections and finds them to be without merit.

Mr. Rosenberg has also enumerated 17 objections to specific tasks claimed as reimbursable by the defendant. In order to determine the proper amount of attorney's fees to be awarded as Rule 37 sanctions, the court will apply the lodestar method. See Smith v. Atlanta Postal Credit Union, 350 Fed. Appx. 347 (11th Cir. 2009). The lodestar method requires the court to multiply "the number of hours reasonably expended on the litigation . . . by a reasonable hourly rate." United States v. Patrol Services, Inc., 202 F. App'x 357, 359 (11th Cir. 2006)(quoting Hensley v. Eckerhart, 461 U.S. 424, 433 (1983)). The lodestar method requires "[t]he fees applicant [to] produce satisfactory evidence that the requested rate is in line with prevailing market rates." Loranger v. Stierheim, 10 F.3d 776, 781 (11th Cir. 1994).

In this case, the defendant has filed a certification by counsel setting forth billing rates for three attorneys as follows: Walter Kruger ($250/hour), D. Albert Brannen ($250/hour), and Tiffany Paige Hiudt Casey ($225/hour) [Doc. No. 83, p. 2]. The

19

Eleventh Circuit has held that district court may use its own discretion and expertise to determine the appropriate hourly rate to apply for an attorney's fee award. See Loranger, 10 F.3d at 781; Norman v. Housing Authority of City of Montgomery, 836 F.2d 1292, 1303 (11th Cir. 1988).  In considering prevailing billing rates in Atlanta for the time period at issue, the court concludes that the rates charged by Kruger, Brannen, and Casey were reasonable.

Mr. Rosenberg's objections center on the amount of time spent on certain tasks and the duplicative nature of certain tasks. Accordingly, with regard to each of his objections, the court will analyze the number of hours expended by each attorney and determine whether the time expended was reimbursable and reasonable.

1. On 9/29/10, Ms. Casey billed 8.0 hours for researching the issues for the motion for sanctions. The court finds this amount of time to be excessive, especially in light of the fact that she billed two hours on the same subjects on 9/24/10 and 9/28/10. A reasonable amount of time would have been 3 hours for such research. Accordingly, the allowable fees will be cut by $1,125.

2. On 10/7 and 10/8/10, Ms. Casey billed a total of 7.0 hours for reviewing the Hudson deposition and inserting relevant portions of the transcript into the sanctions motion. The court finds this amount of time excessive. A reasonable amount of time would have been 3 hours for these tasks. Accordingly, the allowable fees will

20

be cut by $900.

3. On 10/11/10 Mr. Kruger billed 0.4 hours for reviewing the progress on the motion for sanctions. This task was reimbursable, and the time spent was reasonable. Accordingly, the allowable fees will not be cut for this entry.

4. On 10/12 and 10/13/10, Ms. Casey billed a total of 8.3 hours for reviewing and marking the Wingate deposition transcript, beginning to review the Tarkey and Danielson transcripts, and for "continu[ing] motion." [Doc. No. 83-4, P. 5]. The court finds this amount of time excessive. A reasonable amount of time would have been 4 hours for these tasks. Accordingly, the allowable fees will be cut by $967.50.

5. On 10/18 and 10/26/10, Ms. Casey billed a total of 10.0 hours for finishing review of the deposition transcripts, inserting quotations into the motion, and preparing the motion. The court finds this amount of time was excessive, especially in light of the time already spent on these tasks. A reasonable amount of time would have been 5 hours for these activities. Accordingly, the allowable fees will be cut by $1,125.

6. On 11/5 and 11/8/10, Mr. Kruger billed a total of 6.5 hours on preparation for the motion for sanctions. The court finds this amount of time was excessive, especially in light of the amount of time Ms. Casey has already been allowed. A reasonable amount of

21

time would have been 2.0 hours. Accordingly, the allowable fees will be cut by $1,125.

7. On 11/18/10, Mr. Kruger billed 2.0 hours for reviewing a draft of the motion for sanctions. This task was reimbursable, and the time spent was reasonable. Accordingly, the allowable fees will not be cut for this entry.

8. On 11/18/10, Mr. Brannen billed 0.4 hours but provided no description of how the time was spent. Because the court has no way to determine whether the charge was reasonable, the allowable fees will be cut by $100.

9. On 11/19/10 and 11/22/10, Mr. Kruger billed a total of 15.5 hours for preparing the motion for sanctions. This amount of time was unreasonable in light of the time Mr. Kruger and Ms. Casey have already been allowed for the motion. An appropriate amount of time for revision of the motion would have been 2 hours. Accordingly, the allowable fees will be cut by $3,375.

10. On 11/23/10 Mr. Kruger billed 4.0 hours for finalizing, and filing the motion. This task was reimbursable, and the time spent was reasonable. Accordingly, the allowable fees will not be cut for this entry.

11. On 11/29/10, Mr. Kruger billed 0.5 hours for a telephone conference with C. Snyder, which included conversation about the motion for sanctions. This task was reimbursable, and the time

spent was reasonable. Accordingly, the allowable fees will not be cut for this entry.

12. On 12/3/10, Mr. Brannen billed 2.5 hours for preparing for and attending the hearing before the undersigned. The motion for sanctions was filed less than 24 hours before the hearing, and the hearing had been scheduled prior to its filing to resolve outstanding discovery disputes. The sanctions motion came up only incidentally at the hearing. Accordingly, this time is not reimbursable under the court's order [Doc. No. 82], and the allowable fees will be cut by $625.

13. Similarly, on 12/3/10, Mr. Kruger billed 5.6 hours for attending the hearing, reviewing the order that resulted from the hearing, and conferring with C. Snyder. The sanctions motion was only an incidental part of the hearing, and a reasonable amount of time to review the order and confer about those parts related to the sanctions order would have been 0.5 hours. Accordingly, the allowable fees will be cut by $1,275.

14. On 12/6/10, Mr. Brannen billed 0.6 hours for developing a "to do" list after the court's 12/3/10 order. This time is not reimbursable under the court's order [Doc. No. 82], and the allowable fees will be cut by $100.

15. On 12/13/10, Mr. Brannen billed 0.3 hours for reviewing Mr. Rosenberg's response to the motion for sanctions. This task was

23

reimbursable, and the time spent was reasonable. Accordingly, the allowable fees will not be cut for this entry.

16. On 12/17/10, Mr. Kruger billed 3.2 hours to review the motion for sanctions and preparing and filing a reply. These tasks were reimbursable, and the time spent was reasonable. Accordingly, the allowable fees will not be cut for this entry.

17. On 1/3 and 1/4/11, Mr. Kruger billed a total of 16 hours for preparing and taking depositions and then conferring with his client. These tasks were reimbursable, and the time spent was reasonable. Accordingly, the allowable fees will not be cut for these entries.

The allowable fees will thus be cut $10,717.50 from the original award of $26,355.20. Accordingly, Mr. Rosenberg is ORDERED to pay the defendant a total of $15,637.70.

## V. Conclusion

The defendant's motions for summary judgment [Doc. Nos. 36 and 74] are DENIED. Mr. Rosenberg is ORDERED to pay the defendant $15,637.70. The parties are DIRECTED to submit their joint proposed pretrial order within thirty days of the docketing of this order.

SO ORDERED, this <u>29th</u> day of July, 2011.

<u>/s/ Charles A. Pannell, Jr.</u><br>CHARLES A. PANNELL, JR.<br>United States District Judge